**LASALLE BANK NATIONAL ASSOCIATION, f.k.a. LaSalle National Bank, Plaintiff,**

v.

**LEHMAN BROTHERS HOLDINGS, INC., Defendant.**

**No. CIV. H–01–2260.**

United States District Court, D. Maryland.

Dec. 9, 2002.

Gregory A. Cross, Paul D. Barker, Jr., Heather D. Foley and Venable, Baetjer and Howard, LLP, Baltimore, MD, for plaintiff.

Ralph N. Albright, Jr., Joseph Brooks, Yiota G. Souras and Morgan, Lewis and Bockius, LLP, Washington, DC for defendant.

ALEXANDER HARVEY, II, Senior District Judge.

In this civil action, plaintiff LaSalle Bank National Association ("LaSalle Bank") is seeking specific performance of a contract and also damages for breach of

contract. Named as the sole defendant is Lehman Brothers Holdings, Inc. ("Lehman"). Plaintiff LaSalle Bank is a nationally chartered bank located in Illinois, and defendant Lehman is a Delaware corporation with its principal place of business in New York City. Diversity jurisdiction exists under 28 U.S.C. § 1332(a). The question presented is whether plaintiff or defendant should bear the loss resulting from the default of a commercial mortgage.

Pursuant to Scheduling Orders entered by the Court, the parties have engaged in extensive discovery. Presently pending are a motion for summary judgment filed by plaintiff LaSalle Bank and also a motion for summary judgment filed by defendant Lehman. The parties have submitted lengthy memoranda and voluminous exhibits in support of and in opposition to the pending motions. A hearing on the pending motions has been held in open court. For the reasons stated herein, the Court will grant the motion for summary judgment of plaintiff LaSalle Bank and will deny the motion for summary judgment of defendant Lehman.

## I

### Background Facts

The contract at issue was executed by Lehman and First Union Commercial Mortgage Securities, Inc. ("First Union") on November 1, 1997. Termed a Mortgage Loan Purchase Agreement ("MLPA"), the contract provided for the sale by Lehman to First Union of more than two hundred commercial and multi-family mortgage loans. The claims in this action concern one of those loans with an original principal balance of $9 million. Pursuant to the MLPA, the mortgages were to be deposited by First Union into a trust fund which included the mortgage

loan at issue among some 429 others with a face value of over $2.2 billion. It was intended that the trust fund would be created and certificates would be issued pursuant to a Pooling and Service Agreement ("PSA") bearing the same date as the MLPA. Parties to the PSA were First Union, First Union National Bank, CRIIMI MAE Services Limited Partnership ("CMSLP"), LaSalle Bank and ABN AMBRO Bank, N.V. ("AMBRO Bank"). Plaintiff LaSalle Bank serves as the Trustee of the trust in question.

Under the PSA, plaintiff LaSalle Bank as Trustee is responsible for allocating cash flows generated by the loans. The mortgage loans are to be serviced and administered by First Union National Bank as the Master Servicer and CMSLP as the Special Servicer, with AMRO Bank acting as the fiscal agent. The Master Servicer services mortgage loans which are performing, and the Special Servicer services non-performing loans.

In the MLPA, Lehman made numerous representations and warranties with regard to each mortgage loan it sold pursuant to the MLPA. According to § 3(b) of the MLPA, Lehman made these representations and warranties "for the benefit of the Purchaser and the Trustee for the benefit of the Certificateholders." Section 3(c) of the MLPA provides that if Lehman receives notice of a breach of its representations and warranties, it has the duty to cure the breach or repurchase the affected mortgage loan.

On November 25, 1997, the mortgage loans were "securitized." Various classes of investment certificates, each class bearing a different payment priority and corresponding level of risk, were offered for sale pursuant to a Prospectus Supplement.[1] The lowest-rated class, which bore

---

**1.** The Prospectus Supplement listed the representations and warranties made by Lehman in the MLPA.

the "first dollar loss" incurred by the trust, was known as the "B-piece." CRIIMI MAE, Inc. ("CMI"), which is the owner of CMLSP, purchased the entire B-piece for $170 million.

Prior to the execution of the MLPA and the PSA, CMI sent First Union and Lehman a Quote Letter setting forth the terms under which it would purchase the B-piece. Under the terms set forth in the Quote Letter, Lehman was required to provide CMI with copies of its underwriting files so that CMI could "re-underwrite" the loans. CMI then had the right to demand that loans not approved by it would not be included in the pool.[2] After CMI completed re-underwriting the loans, it was required to transfer the loan documents it had received from Lehman to CMSLP.

At issue in this case is a $9 million mortgage loan which Lehman sold to First Union as a part of the MLPA. The loan in question was originated in 1997 and was secured by a large parcel of improved industrial property located in Farmingdale, New Jersey. This real property ("the FEL Facility") consists of 112 acres and contains nine one-story buildings. From 1987 until 1997 the property was owned by Dr. William D. Hurley ("Hurley") and leased to his company known as Frequency Engineering Laboratories ("FEL"). The FEL Facility has had a long history of environmental problems. FEL was a government contractor which manufactured military communications equipment and weapons systems. The manufacturing process involved the use of heavy metals and volatile organic solvents.

During the 1980's, the FEL Facility was cited by the New Jersey Department of Environmental Protection ("NJDEP") for several environmental infractions. In 1994, Aqua Terra Environmental Services Corp. ("AquaTerra") performed a Phase I environmental site assessment[3] on the FEL Facility. Based on its investigation, AquaTerra concluded that there was potential soil and groundwater contamination and recommended a regulatory compliance audit and a subsurface investigation to determine the extent of any contamination. In 1996, AquaTerra performed a Phase I assessment update for the FEL Facility, again recommending that a subsurface investigation be performed in order to determine whether any soil or groundwater contamination existed.

In August 1996, TTI Environmental, Inc. ("TTI") conducted limited soil and groundwater sampling at the FEL Facility as recommended by AquaTerra. TTI's investigation revealed groundwater contamination and levels of volatile organics ("VOCs") which exceeded NJDEP ground water quality standards.[4] In its report, TTI recommended further evaluation of the groundwater.

After receiving the TTI report, Hurley retained the law firm of Farer Siegal Fersko ("Farer Fersko") to provide advice on environmental matters related to the FEL Facility. On August 19, 1996, Farer Fersko sent Hurley a letter setting forth its recommendations based on its review of the available environmental reports. Farer Fersko recommended, *inter alia*, that Hurley report the presence of hazardous substances on the property to the NJDEP

---

**2.** CMI exercised this option and rejected seven loans totaling over $40 million.

**3.** A Phase I investigation is the initial step in assessing the environmental risks of a property and is designed to identify areas of concern which may need further investigation. If a Phase I investigation reveals areas of concern, then a Phase II investigation is performed.

**4.** Included were the volatile organics trichloroethene tetrachloroethene and the semi-volatile organic hexachlorobutodiene, all of which exceeded NJDEP standards.

and institute a plan to determine the extent of groundwater contamination.

In June of 1997, Farer Fersko hired Phoenix Environmental Management, Inc. ("Phoenix") to conduct another environmental assessment of the FEL Facility. Phoenix installed five permanent monitoring wells around one of the buildings located on the FEL Facility to test for the presence of five specific metals. Phoenix did not test for the presence of VOCs. The results of three rounds of testing showed elevated levels of one of the five metals thought to be of concern. Phoenix issued a report, referencing and attaching the 1996 TTI report, recommending that no further action be taken with respect to soils or groundwater contaminants.

On September 23, 1997, Farer Fersko submitted to the NJDEP Hurley's application requesting that the NJDEP enter into a Memorandum of Agreement ("MOA") addressing environmental issues at the FEL Facility. The application was signed by Hurley and disclosed the fact that certain metals had been found in the groundwater on the FEL Facility.

At this same time, Hurley was seeking refinancing of the FEL Facility. He transferred the FEL Facility to an entity owned by him and known as WDH Howell, LLC ("Howell"), and he applied to Holliday Fenoglio, L.P., a Florida mortgage entity ("Holliday"), for a loan. Holliday had a contract with Lehman whereby Holliday would locate and originate commercial mortgage loans and Lehman would agree to purchase these loans from Holliday for inclusion in a mortgage pool. On October 8, 1997, Holliday, by way of a Mortgage and Security Agreement, extended a mortgage loan to Howell in the amount of $9 million which was secured by the FEL Facility (the "FEL Facility Mort-

gage Loan"). Defendant Lehman later purchased this commercial mortgage loan from Holliday and resold it to First Union pursuant to the MLPA of November 1, 1997.[5]

Pursuant to the terms of the FEL Facility Mortgage Loan, Hurley, as an indemnitor together with Howell, represented that the property was in full compliance with all applicable laws and that all representations and warranties made by each indemnitor in any loan document were true and correct. In addition, Hurley and Howell also executed on October 8, 1997 an Environmental Indemnity Agreement in which they made numerous representations and covenants concerning the environmental condition of the FEL Facility. A breach of any one of these representations and covenants constituted a default under the terms of the FEL Facility Mortgage Loan.

On October 10, 1997, just two days after the mortgage loan closed with Lehman, Hurley signed the proposed MOA with the NJDEP allowing him to undertake an investigation and remediation of environmental contamination at the FEL Facility. On October 23, 1997, Hurley sent the NJDEP a copy of the Phoenix report and the attached TTI report.

When the NJDEP completed its review of the Phoenix report, it determined that the report and Phoenix's investigation were deficient. In a letter dated June 1, 1998, the NJDEP explained that one of the deficiencies in Phoenix's assessment was that VOCs had not been sampled in the monitoring wells nor mentioned in Phoenix's report. Further environmental testing was performed on the FEL Facility in April 1999, in September and October 1999, and in May 2001. Each test re-

**5.** Holliday and Lehman had previously, on December 16, 1996, entered into an agreement whereby Holliday would originate commercial real estate loans which would then be purchased by Lehman for the purpose of securitizing such loans.

vealed levels of VOCs far exceeding the NJDEP groundwater quality standards.

In April 2000, the FEL Facility Mortgage Loan was transferred to CMSLP for special servicing because Howell had defaulted in making mortgage payments. After CMSLP began servicing the loan, it had another Phase I assessment performed on the FEL Facility, which revealed serious environmental contamination. On August 3, 2000, CMSLP instituted a foreclosure action against the FEL Facility property in a state court in New Jersey. *La-Salle National Bank v. WDH Howell, LLC, et al.,* No. F–12652–00 (Superior Court of New Jersey, Chancery Division, Monmouth County). That action was stayed when Howell sought Chapter 11 bankruptcy protection on January 18, 2001 in the United States Bankruptcy Court for the District of New Jersey. *In re WDH Howell, LLC,* Bankruptcy No. 01–50618 (United States Bankruptcy Court for the District of New Jersey). On May 24, 2001, Hurley himself and the FEL Facility also sought protection under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.[6]

By letter dated December 11, 2000, CMSLP notified LaSalle Bank and others that the warranties and representations set forth in the MLPA had been breached because the FEL Facility property was environmentally contaminated at the time of the loan. The request was made that the Master Servicer demand that Lehman cure or repurchase the loan pursuant to § 2.03(a) of the PSA. A copy of that letter was sent to Lehman. On January 25, 2001, Lehman denied the existence of any breach.

On August 1, 2001, plaintiff LaSalle Bank filed this civil action in this Court.

In its complaint, plaintiff alleges that Lehman breached certain representations and warranties and certain remediation provisions of the MLPA. It is alleged that, notwithstanding representations and warranties of Lehman, the FEL Facility was environmentally contaminated at the time of the sale, and that the borrower was in default under its mortgage at the time that the MLPA and the PSA were executed. In Count 1 of the complaint, plaintiff La-Salle Bank seeks specific performance of the contract, and in Count 2, plaintiff La-Salle Bank has demanded damages for breach of contract.

Lehman answered the complaint and filed a motion for judgment on the pleadings on the ground that LaSalle Bank did not commence this action within the applicable three-year statute of limitations. After converting Lehman's motion into a motion for summary judgment, this Court denied that motion. *See LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.,* 188 F.Supp.2d 595 (D.Md.2002). Defendant Lehman has now filed a renewed motion for summary judgment, and plaintiff LaSalle Bank has also filed a motion for summary judgment. It is these motions which are before the Court for decision.

## II

### Summary Judgment Principles

It is well established that a party moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment or partial summary judgment as a matter of law. *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). The movant's burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. *Id.*

---

6. These cases are still pending before the Bankruptcy Court in Trenton, New Jersey.

The burden is on the moving party at the summary judgment stage to show that there is an absence of evidence to support the nonmoving party's position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), when the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick,* 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967), *cert. denied,* 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Catrett,* 477 U.S. at 323–24, 106 S.Ct. 2548).

Applying these principles to the facts of record here, this Court has concluded that the motion of plaintiff LaSalle Bank for summary judgment must be granted and that the motion for summary judgment of defendant Lehman must be denied.

## III

### *Applicable Principles of Law*

▪ Both the MLPA and the PSA provide that they should be construed according to New York law. Maryland has recognized that the parties to a contract may agree as to the law which will govern their transaction. *National Glass, Inc. v. J.C. Penney Properties, Inc.,* 336 Md. 606, 610, 650 A.2d 246 (1994).

▪ Under New York law, an action for breach of contract requires proof of: (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages. *WorldCom, Inc. v. Sandoval,* 182 Misc.2d 1021, 701 N.Y.S.2d 834, 836 (N.Y.Sup.Ct.1999) (citing *Rexnord Holdings v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994)). A buyer may hold a seller accountable for breach of an express warranty upon a showing: (1) that the plaintiff and defendant entered into a contract; (2) that the contract contained an express warranty by the defendant with respect to a material fact; (3) that the warranty was part of the basis of the bargain; and (4) that the defendant breached the express warranty. *Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628, 642 (S.D.N.Y.1999). In order to trigger a repurchase obligation of the seller, any breach of warranty must be a material breach. *See Morgan Guaranty Trust Co. of New York v. Bay View Franchise Mortgage Acceptance Co.,* 2002 WL 818082 (S.D.N.Y. April 30, 2002).

## IV

### *Plaintiff's Motion for Summary Judgment*

Pursuant to the MLPA, Lehman must, if it received notice of a breach of its repre-

sentations and warranties relating to a mortgage loan sold thereunder, within ninety days after receipt of notice of the breach (1) cure such breach in all respects or (2) repurchase the mortgage loan in question from the Trustee pursuant to the PSA at a price equal to the purchase price. Section 3(c), MLPA. In support of its motion for summary judgment, plaintiff asserts that defendant Lehman breached various representations and warranties in the MLPA relating to environmental contamination of the FEL Facility property. The parties now agree that when the mortgage loan was made by Holliday, the property was environmentally contaminated as a result of the presence of metals and organic compounds in the ground water. Such contamination did not satisfy New Jersey ground water quality control standards and required extensive remediation which would adversely affect the value of the mortgaged real property.

Plaintiff contends that Schedule I of the MLPA sets forth numerous material representations and warranties made by Lehman. Plaintiff contends that Lehman breached warranties xiv, xx, xxii and xlvi of Schedule I of the MLPA. According to plaintiff, each and every one of these breaches triggered Lehman's duty to cure the breach or to repurchase the FEL Facility Mortgage Loan.

■ In opposing plaintiff's motion for summary judgment, Lehman first argues that the warranties made by it in the MLPA were not a part of the basis of the bargain. Pursuant to the applicable legal principles, this Court must disagree.

■ In determining whether the warranties made by a defendant were a part of the basis of the bargain between the parties, the critical question is "whether the buyer believed it was purchasing the seller's promise as to the [warranty's] truth." *CBS, Inc. v. Ziff–Davis Publ'g Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 453,

553 N.E.2d 997 (1990). Inclusion of a warranty in a "Representations and Warranties" section of a contract establishes that the warranty was part of the bargain reached by the parties. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 360 (2d Cir.1992).

The warranties made by Lehman were set forth in some detail in Schedule I attached to the MLPA. Schedule I clearly constitutes a "representations and warranties" section of the contract between the parties. The Court accordingly concludes that the warranties relied upon by plaintiff LaSalle Bank were a part of the basis of the bargain reached by the parties in the MLPA.

(a)

*Warranty xiv*

In Warranty xiv, Lehman represented that no material defaults existed under any of the mortgages sold by it pursuant to the MLPA. Warranty xiv states in pertinent part:

Other than payments due but not yet 30 days or more delinquent, (A) there is no material default, breach, violation or event of acceleration, and there is no other material default, breach, violation or event of acceleration, existing under the related Mortgage Note or each related Mortgage . . . .

Section 9.1 of the Mortgage and Security Agreement of October 8, 1997 between Holliday and Howell defines an event of default as including any false or misleading representation or warranty by Howell or Hurley in any "Loan Documents" and any failure to perform any obligation under the Environmental Indemnity Agreement. In this mortgage agreement, Howell represented that it "had not failed to disclose any material fact that could cause any representation or warranty made [in the mortgage] to be materially misleading." With respect to the environmental condi-

tion of the property, Howell represented that the property was in compliance with all applicable laws. In addition, Howell made numerous other representations in the Environmental Indemnity Agreement.

Plaintiff argues that evidence of record here reveals numerous misrepresentations by Howell and Hurley regarding the environmental condition of the FEL Facility. Plaintiff sets forth eleven alleged misrepresentations each of which, according to plaintiff, constituted a material breach of Howell and Hurley's representations.

█ Defendant first argues that plaintiff's reliance on Warranty xiv is an attempted end run around Warranty xx. According to Lehman, it represented in Warranty xx that it had no knowledge of material and adverse environmental conditions other than those disclosed in the referenced environmental reports. Defendant contends that plaintiff's interpretation of Warranty xiv would require that Lehman be responsible for warranties of adverse environmental conditions which were not disclosed in the reports themselves. Defendant maintains that plaintiff's interpretation of Warranty xiv would render Warranty xx superfluous.

On the record here, this Court concludes that the interpretation of Warranty xiv relied upon by plaintiff does not render Warranty xx superfluous. Warranty xiv addresses material defaults in the underlying mortgage loans while Warranty xx addresses environmental due diligence and Lehman's knowledge of environmental conditions not disclosed in certain referenced reports. As plaintiff points out, there is nothing in the MLPA that exculpates Lehman from liability for the default of Howell and Hurley merely because the facts were not uncovered by Lehman's environmental due diligence. The Court cannot agree with Lehman that it would be unfair to hold Lehman accountable for adverse environmental conditions of which it was not aware. Presumably, Lehman would have a viable claim against Holliday, Howell and Hurley if Howell and Hurley breached warranties and representations in the underlying FEL Facility Mortgage Loan.[7]

█ The record here discloses that Howell and Hurley were in default of the FEL Facility Mortgage Loan as a result of multiple misrepresentations made by them regarding the environmental condition of the mortgaged property. The representations and warranties made by Howell and Hurley in the Environmental Indemnity Agreement were quite broad. They represented, *inter alia*, that there are no past or present releases of hazardous substances on the property nor past or present non-compliance with environmental laws which were not disclosed in the environmental reports given to the lender Holliday. Howell and Hurley further represented that they had provided to the lender Holliday any and all information relating to conditions in, on, under or from the mortgaged property as known to them. Evidence of record discloses that Howell and Hurley withheld critical information relating to the environmental condition of the FEL Facility property. Such information was clearly material. Howell and Hurley failed to disclose, *inter alia*, (1) elevated levels of VOCs in excess of NJDEP standards, (2) environmental infractions documented in two prior NJDEP reports, and (3) communications with the NJDEP relating to the application for the MOA which was later executed by the NJDEP. In addition, Howell and Hurley failed to disclose the fact that Phoenix had recommended further testing for VOCs

7. Repurchase by Lehman of the FEL Facility Mortgage Loan would entitle it to assert a secured claim against Howell and Hurley in the pending bankruptcy proceedings.

but that Farer Fersko and Hurley had told Phoenix not to test for those substances.

Paragraph 1 of the Environmental Indemnity Agreement, *inter alia,* contained the following Warranties and Representations:

(e) [Howell and Hurley]...do not know of, and have not received, any written notice or other communication from any person or entity (including but not limited to a governmental entity) relating to Hazardous Substances or Remediation (defined below) [8] thereof, of possible liability of any person or entity pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings .in connection with any of the foregoing; and

(f) [Howell and Hurley] ...have truthfully and fully provided to [Lender], in writing, any and all information relating to conditions in, on, under or from the Property that is known to...[either Howell or Hurley] and that is contained in files and records of...[Howell and Hurley], including but not limited to any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

It is apparent from evidence of record here that Howell and Hurley were so anxious to secure the loan from Holliday that they attempted to conceal existing environmental contamination by failing to disclose in the loan documents numerous material facts concerning the environmental condi-

tion of the FEL Facility property. .Indeed, Farer Fesko addressed a letter to Hurley dated August 19, 1996 in which it was stated, *inter alia,* that ground water samples revealed levels of 'contaminants including metals and volatile organics above NJDEP quality standards, that the 1994 and 1996 assessments indicated that hazardous substances or wastes from prior operations at the site had likely impacted the environment and that Farer Fesko was advising that the identified contamination be promptly reported to the NJDP so that a comprehensive response plan could be implemented. Six separate paragraphs of this August 19 letter, several of which contained the statements listed above, were eliminated in the August 20 version of that letter which was sent by Hurley to Holliday in support of Howell's application for the $9 million mortgage loan. Although the Farer Fesko letter of August 20 was submitted as a part of Howell's representations concerning the environmental condition of the FEL Facility property, it did not contain the adverse comments which Farer Fesko had included in its August 19 letter to Hurley.

This Court concludes that evidence of record establishes as a matter of law that the FEL Facility Mortgage was in default on November 25, 1997. This default was material .and constituted a breach of the warranty made by Lehman in Warranty xiv of the MLPA. ·

(b)

*Warranties xxii and xlvi*

 Warranties xxii and xlvi of the MLPA both deal with the origination stan-

---

**8.** As defined in the Environmental Indemnity Agreement, "Remediation" includes but is not limited to "any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation· relating to any Hazardous Substances...."

dards under which the mortgage loans were made. In Warranty xxii, Lehman represented that the mortgagor of each property had covenanted to maintain the related property in compliance with all applicable laws and that the originator had performed "the type of due diligence in connection with the origination of such Mortgage Loan customarily performed by prudent institutional commercial and multifamily mortgage lenders." In Warranty xlvi, Lehman represented that, "[t]he origination, servicing and collection practices used by [Lehman] or any prior holder of the Mortgage Note have been in all respects legal, proper and prudent and have met customary industry standards."

In contending that defendant Lehman breached these two warranties, plaintiff argues that the origination and underwriting practices of Holliday and Lehman with respect to the FEL Facility Mortgage Loan did not meet Lehman's own underwriting guidelines nor did they meet industry standards. Plaintiff has listed numerous ways in which Lehman allegedly breached these two warranties. In response, defendant Lehman asserts that the record here does not disclose a breach by Lehman of either one of these two warranties.

The parties rely on expert deposition testimony in support of the positions they have taken on this issue. Plaintiff refers to the testimony of Ronald F. Greenspan ("Greenspan"), an expert on underwriting and the securitization of loans. Greenspan testified that the origination and underwriting practices of both Lehman and Holliday were not prudent and did not meet industry standards. Lehman in turn relies on the expert testimony of Thomas R. Vetrano ("Vetrano"). Vetrano testified that Lehman's underwriting decisions

were "reasonable, based upon the information available to Lehman Brothers at the time of the closing of the loan." Vetrano specifically acknowledged, however, that he was rendering an opinion only as to Lehman's underwriting practices and not as to those of Holliday.

On this record, the Court concludes that the origination and underwriting practices of both Holliday and Lehman with respect to the FEL Facility Mortgage Loan were not prudent and did not meet industry standards. The evidence here reveals that Lehman and Holliday, *inter alia*, did not follow AquaTerra's recommendation that, even though the Prospectus Supplement informed investors that Phase I recommendations were being followed, a subsurface investigation should be performed before the closing. Moreover, evidence of record indicates that Lehman and Holliday did not obtain a new Phase I report before the closing as required by Lehman's guidelines and as represented in the Prospectus Supplement. Rather, Lehman obtained an updated environmental assessment from AquaTerra only after the loan had closed,[9] and in requesting such a report, Holliday suggested to AquaTerra that it come to the same conclusions as did AquaTerra's earlier report.

This Court concludes that the expert testimony of Greenspan that the underwriting practices of Lehman and Holliday did not meet industry standards is not controverted on the record here. Defendant's expert Vetrano offered no opinion as to the quality of Holliday's underwriting of the FEL Facility Mortgage Loan, but opined merely that Lehman's underwriting of the loan was "reasonable." At no point in his testimony did Vetrano state, as represented in Warranties xxii and xlvi, that

---

9. Neither Lehman nor Holliday had ever previously ordered a third-party environmental report after a loan of this sort had closed.

the underwriting practices of both Lehman and Holliday were prudent and met customary industry standards.

██ Defendant argues that CMI did its own "re-underwriting" and that as a result of its due diligence CMI should be the party to bear the loss. But CMI was merely the purchaser of the so-called "B-piece," and the due diligence conducted by it was done solely for its own account as a certificateholder. CMI had no duty to undertake any due diligence on behalf of the trust or any of the other certificateholders. LaSalle Bank, as the Trustee, had the right to rely in the event of default on Lehman's representations and warranties, including those relating to the origination and underwriting practices employed by Holliday and Lehman with respect to the FEL Facility Mortgage Loan.

Evidence of record here establishes as a matter of law that the origination and underwriting practices of both Holliday and Lehman with respect to the FEL Facility Mortgage Loan were not prudent and did not meet customary industry standards. Accordingly, this Court concludes that Lehman breached both Warranty xxii and Warranty xlvi of the MLPA.[10]

### (c)

### Summary—Breach of Warranties

In sum, the Court is satisfied that Lehman and not LaSalle Bank must bear the loss arising as a result of the mortgage default of Hurley and Howell. Under the various documents included in the record here, Lehman and not LaSalle Bank assumed the risk that the mortgaged property was environmentally contaminated when the $9 million was loaned to Hurley.

As Trustee, LaSalle Bank was not involved in any way in the origination of the loan and had the right under the various

agreements to look to Lehman and its representations and warranties to protect itself from loss resulting from the default. Plaintiff's motion for summary judgment will therefore be granted.

### V

### Defendant's Motion for Summary Judgment

Besides opposing the motion for summary judgment of plaintiff LaSalle Bank, defendant Lehman has itself moved for summary judgment. In support of its motion, defendant Lehman contends: (1) that plaintiff LaSalle Bank is not the real party in interest under Rule 17(a), F.R.Civ.P., because evidence shows that CMSLP is the only real party in interest; (2) that plaintiff's claims are barred by the Maryland three-year statute of limitations; (3) that the warranties at issue cannot be enforced against Lehman due to environmental disclosures which Lehman made to First Union prior to the closing on the sale of the mortgage loan; and (4) that since defendant Lehman was not provided with reasonably prompt notice of the alleged breaches of warranty, enforcement of the cure or repurchase clause of the MLPA is barred.

### (a)

### Real Party In Interest

██ Relying on Rule 17(a), F.R.Civ.P., Lehman contends that the PSA grants CMSLP the exclusive right to bring suit when a loan is referred to it for special servicing. According to Lehman, there is no provision in the PSA expressly authorizing LaSalle Bank to prosecute claims relating to loans which have been referred for special servicing to CMSLP.

Rule 17(a) provides in pertinent part as follows:

---

**10.** Since the Court has concluded that defendant Lehman breached Warranty xiv, Warranty xxii and Warranty xlvi, and must there-

fore repurchase the mortgage loan at issue, it is not necessary to address plaintiff's contention that Lehman also breached Warranty xx.

Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, . . . may sue in that person's own name without joining the party for whose benefit the action is brought . . . .

■■■■ The purpose of Rule 17 is to ensure that an action is brought by a person who has the right to enforce the claim and who has a significant interest in the case. *Virginia Elec. & Power Co. v. Westinghouse Elec. Corp.,* 485 F.2d 78, 83 (4th Cir.1973). Whether a plaintiff is entitled to enforce the asserted right is determined according to substantive law. *Id.* As noted herein, both the MLPA and the PSA by their terms are governed by New York law. This Court must therefore look to New York law to determine whether LaSalle Bank as Trustee under the PSA is entitled to bring this action.

■■■ Under New York law, a trustee's powers are defined in the trust instrument. *Colorado & Southern Ry. Co. v. Blair,* 214 N.Y. 497, 511–12, 108 N.E. 840 (1915). In this case, the PSA defines the powers of both the Trustee and the Special Servicer. Section 2.01 of the PSA provides that First Union "does hereby assign, sell, transfer, set over and otherwise convey to the Trustee in trust . . . all the right, title, and interest" that First Union then held in the mortgages. Section 8.02(iii) states:

the Trustee shall be under no obligation . . . to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses

and liabilities which may be incurred therein or thereby.

Section 3.01(b) gives CMSLP as Special Servicer the "full power and authority, acting alone, to do or cause to be done any and all things in connection with [the] servicing and administration" of mortgage loans referred to it. The parties agree that § 3.01(b) of the PSA grants CMSLP the power to initiate actions in its own name with respect to loans that have been referred to it for special servicing and that CMSLP would therefore have been entitled to bring this action. The parties dispute, however, whether the PSA also grants LaSalle Bank, in its capacity as Trustee, the power to initiate litigation. LaSalle Bank argues that both § 2.01 and § 8.02(iii) of the PSA grant the Trustee the power to prosecute and defend on behalf of the certificateholders legal actions.

A case remarkably similar to this one is *LaSalle Bank Nat'l Assoc. v. Nomura Asset Capital Corp.,* 180 F.Supp.2d 465 (S.D.N.Y.2001). In *Nomura,* the Court rejected the defendant's argument that the special servicer, and not the trustee, was the real party in interest. Like the case at hand, *Nomura* involved a sale of mortgage loans to a trust and the issuance of certificates pursuant to a pooling and servicing agreement.[11] LaSalle Bank served as the trustee of the trust, and Lend Lease Asset Management, L.P. ("Lend Lease") served as the special servicer. The defendant argued that Lend Lease and not LaSalle Bank was the real party in interest because the pooling and servicing agreement granted the special servicer the power to initiate litigation with respect to defaulted loans. *Id.* at 470.

The Court in *Nomura* rejected the defendant's argument concluding that "it is clear that LaSalle is a traditional trustee

---

11. Many provisions of the pooling and servicing agreement in *Nomura* are exactly the same as provisions of the PSA executed by

First Union, LaSalle Bank and others in this case.

who simply contractually delegated some of its duties to [the special servicer]." *Id.* The Court held that the terms of the pooling and servicing agreement granted LaSalle Bank the power to bring suit on behalf of the certificateholders. *Id.* at 471. As the Court explained, the plain meaning of § 2.01 [12] "ordinarily includes the power to bring suit to protect and maximize the value of the interest thereby granted." *Id.* In concluding, the Court stated: "the mere fact that the PSA assigns certain duties to Lend Lease in connection with maximizing recovery of defaulted loans does not affect the basic premise ... that a trustee of an express trust is the real party in interest when suing on behalf of that trust." *Id.*

This Court is in full agreement with the reasoning of and the conclusion reached in *Nomura.* Merely because the PSA in this case delegates to CMSLP the right to institute a suit in its capacity as Special Servicer does not affect the basic premise that the trustee of an express trust is the real party in interest when suing on behalf of the trust. Section 3.01 of the PSA grants CMSLP the power to act "alone" and "in its own name" in certain circumstances, but in no way suggests that this power is exclusive or somehow restricts the power and authority of LaSalle Bank as the Trustee. That CMSLP and LaSalle Bank each have the authority to institute suit does not negate the right of LaSalle Bank to so act.

Lehman argues that *Nomura* is distinguishable because the pooling and servicing agreement in *Nomura* contained a provision, not found in the PSA in this case, expressly authorizing the trustee to initiate and prosecute litigation. There is no merit to this argument. The *Nomura* Court held that the trustee's power to initiate litigation came from two separate and independent provisions of the pooling and servicing agreement, namely § 3.07 which expressly granted the trustee the power to bring litigation and § 2.01 which impliedly granted the trustee the power to bring litigation. *Id.* at 471. The Court concluded that either one of those provisions, standing alone, granted the trustee the power to bring suit. Although the PSA in this case does not contain a provision expressly granting LaSalle Bank the power to bring suit, it does contain a provision which is identical to § 2.01 of the pooling and servicing agreement in *Nomura.* Section 2.01 of the PSA in this case, when read together with other provisions of the PSA, grants LaSalle Bank the authority to institute this action as the real party in interest.

In contending that LaSalle Bank is not under Rule 17(a) the real party in interest, defendant relies on *Piambino v. Bailey,* 610 F.2d 1306 (5th Cir.1980). In *Piambino,* the trust documents at issue authorized the compliance officer to enforce the rights of the beneficiaries but was silent as to whether the trustee was authorized to do so. The Fifth Circuit held that the compliance officer and not the trustee had the power to enforce the rights of the beneficiaries. *Id. Piambino* is distinguishable from this case because the trust agreement at issue there stated that the named trustee "shall have no discretion or authority or responsibility under the provisions of the [Instructions to Compliance Officer]." *Id.* at 1322. The PSA in this case gives the Trustee oversight powers and repeatedly states that the Special Servicer serves on behalf of the Trustee.

For these reasons, this Court concludes that LaSalle Bank is the real party in interest in this case and that the claims asserted by it are not subject to dismissal

---

12. Section 2.01 of the pooling and serving agreement in *Nomura* is identical to § 2.01 of the PSA in this case.

under Rule 17(a). The *Nomura* case is directly on point, and this Court agrees with the reasoning in that case. As in *Nomura*, the PSA here gives LaSalle Bank the power to bring litigation on behalf of the certificateholders.

### (b)
### *Statute of Limitations*

■ Under Maryland law, a civil action must be filed within three years of the date when the cause of action accrues. Md.Code Ann. Cts. & Jud. Proc. § 5–101. The question when an action accrues is left to judicial determination. *Harig v. Johns–Manville Prods. Corp.*, 284 Md. 70, 75, 394 A.2d 299 (1978).

■ Maryland follows the discovery rule under which the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong. *Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677 (1981). Thus, a limitations period begins to run when the claimant gains "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Id.* at 637, 431 A.2d 677 (citation omitted). Recently, the Court of Appeals confirmed that the discovery rule applies in breach of contract cases, but noted that "when the date of the breach and the discovery of the breach are the same, the discovery rule is satisfied." *Bragunier Masonry Contractors, Inc. v. The Catholic Univ. of America*, 368 Md. 608, 628, 796 A.2d 744 (2002).

■ Defendant Lehman contends that this action is barred by limitations. Plaintiff's complaint was filed in this Court on

August 1, 2001. According to defendant, any alleged breach on its part occurred on November 25, 1997, which was over three years and eight months before plaintiff's complaint was filed. Defendant thus argues that the applicable three-year Maryland statute of limitations had expired when this civil action was filed.

It is undisputed that the warranties at issue were all made by Lehman on November 25, 1997, which was the date of the MLPA closing. It is also not disputed that Warranty xx specifically referenced certain environmental reports. Defendant argues that the reports referenced in Warranty xx disclosed that the FEL Facility was environmentally contaminated, and contends that First Union and LaSalle Bank, as parties to the MLPA, were charged with knowledge of the information contained in these reports whether or not they had read them. According to defendant, since the reports charged LaSalle Bank with knowledge of the information contained therein, LaSalle Bank was placed on inquiry notice of a potential breach of warranty on November 25, 1997. In order for this Court to find that the claim of LaSalle Bank is barred by limitations, it must under the applicable Maryland law determine: (1) that the reports referenced in Warranty xx disclosed that the FEL Facility was environmentally contaminated; and (2) that LaSalle Bank must under the evidence here be charged with knowledge of the information contained in those reports.

This Court has reviewed the entire record in this case, including the documents and cases cited by defendant Lehman at the hearing.[13] Following such review, the Court concludes that the reports referenced in Warranty xx would not have

---

**13.** During the hearing held on November 22, 2002, defendant argued that this Court could conclude that plaintiff's claims were barred by limitations by reviewing just three documents and two cases: (1) the MLPA; (2) the 1997 Phoenix Report; (3) the Environmental Indemnity Agreement; (4) *Legg v. County*

placed LaSalle Bank on inquiry notice that the FEL Facility was environmentally contaminated or that Lehman had breached in any other way the warranties made by it. The parties agree that the reports referenced in Warranty xx are the Phoenix report and the attached TTI report. Although the Phoenix report indicated that certain contaminants were found at the FEL Facility, the conclusion of the report proposed *"no further action"* for soils or groundwater contaminants. (Emphasis added). A person of ordinary prudence reviewing this report would have concluded that if any of the contaminants found at the FEL Facility were of concern, the report would have recommended further testing or a remediation plan but would not have recommended (as it did) that no further action should be taken. It is also significant that the Phoenix report dealt only with a small portion of the FEL Facility and did not address other material matters, including, *inter alia*, that there was environmental contamination at an adjacent site and that AquaTerra had recommended that a full ·site investigation be conducted.

Lehman has repeatedly denied in this case that it was put on notice of environmental contamination at the FEL Facility as a result of its review of the Phoenix and TTI reports. Lehman's own expert has testified that a review of the Phoenix and TTI reports would not have alerted Lehman to the presence of material environmental contamination at the FEL Facility. Furthermore, Lehman's answer to an interrogatory also denies that a review of the referenced reports would have revealed material environmental contamination. Lehman's response to Interrogatory No. 20 states:

> .... Based on its knowledge from the environmental reports regarding the environmental condition of the FEL Facility at the time of the Closing Date [November 25, 1997], Lehman disclosed the prior presence of certain substances at the FEL Facility and was informed by environmental consultants that no remediation of the soils and groundwater underlying the property was expected to be required by the NJDEP. *Under the NJDEP's standards, the FEL Facility was not known to be environmentally contaminated.* (Emphasis added).

Moreover, although Lehman had reviewed the Phoenix and TTI reports, witnesses designated by Lehman to testify on its behalf denied that Lehman was aware that material environmental contamination existed at the FEL Facility.

Notwithstanding the fact that Lehman has consistently denied that it was put on notice of environmental contamination as a result of its review of the Phoenix and TTI reports, Lehman nevertheless now argues that those same reports put LaSalle Bank on inquiry notice of contamination at the FEL Facility. Defendant points to testimony of plaintiff's environmental expert that the reports identified "serious environmental risks." In addition, defendant points to the CMSLP letter dated December 11, 2000 which states that the reports revealed "significant environmental issues." Defendant's reliance on this evidence is misplaced.

As noted herein, defendant's contention that these reports put LaSalle Bank on inquiry notice is significantly undermined by its position that these same reports did not put Lehman on notice of contamination at the FEL Facility.[14] Although the Phoe-

*Commissioners,* 200 F.Supp.2d 535 (D.Md. 2002); and (5) *Bragunier Masonry Contractors, Inc. v. The Catholic Univ. of America,* 368 Md. 608, 796 A.2d 744 (2002).

14. Unlike defendant, which has taken inconsistent positions with regard to the impact of the Phoenix and TTI reports, plaintiff does not rely on these reports to support its claim that

nix report identified some environmental concerns, it did not propose any further testing or remediation, and it ultimately concluded that no further action was required for soils or groundwater contaminants.

In sum, this Court is satisfied on the record here that the contents of the Phoenix report and those of the attached TTI report would not have put LaSalle Bank on inquiry notice that the FEL Facility was contaminated or that Lehman had breached any of its warranties. LaSalle Bank had no knowledge of circumstances which would have put it on inquiry notice until December 11, 2000, when it received a letter from CMSLP describing serious contamination at the FEL Facility property. Accordingly, this Court finds and concludes that the statute of limitations period did not begin to run until December 11, 2000. Because plaintiff's claim was properly brought within three years of that date, defendant's statute of limitations defense must fail.[15]

(c)

*Defendant's Waiver Defense*

■ In support of its motion for summary judgment, defendant Lehman has also argued that plaintiff's claims based upon alleged breach of the warranties at issue here are foreclosed as a matter of law by Lehman's pre-closing disclosures. According to Lehman, the environmental contamination of the FEL Facility was disclosed to LaSalle Bank prior to the closing date of November 25, 1997. In support of this argument, defendant once

again notes that the Phoenix report and the TTI report were referenced in Warranty xx and once again contends that the contents of those reports disclosed that the FEL Facility property was contaminated. Lehman maintains that as a result of such disclosure, plaintiff LaSalle Bank waived its right to claim that the warranties at issue were breached.

■ As noted hereinabove, a plaintiff suing for breach of warranty need not under New York law prove that it relied on the truth of the fact warranted in order to establish the defendant's liability for breach of warranty. *Ziff–Davis,* 554 N.Y.S.2d at 453, 553 N.E.2d 997. In *Galli v. Metz,* 973 F.2d 145 (2d Cir.1992), the Second Circuit held that the ruling in *Ziff–Davis* applied in cases where the truth of the warranties was uncertain or in dispute at the time of execution of the contract. The Court explained, however, that "[w]here a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach ...." *Id.* at 151. In *Rogath v. Siebenmann,* 129 F.3d 261, 265 (2d Cir.1997), the Second Circuit reaffirmed the *Galli* exception to the *Ziff–Davis* rule, holding that "where the seller discloses up front the inaccuracy of certain of its warranties, it cannot be said that the buyer—absent express preservation of his rights—believed

the FEL Facility was contaminated but instead has consistently asserted that these reports misled all who read them, leading them to believe that the FEL Facility was not environmentally contaminated on November 25, 1997.

**15.** Because this Court has concluded that the information contained in the reports referenced in Warranty xx would not have put

LaSalle Bank on inquiry notice of a potential breach, it is not necessary for the Court to consider whether LaSalle Bank should be charged with First Union's knowledge of the information contained in those reports as an assignee or third-party beneficiary, and whether plaintiff's claims are for breach of warranty or for breach of defendant's obligations to cure breaches or repurchase the FEL Facility Mortgage Loan.

he was purchasing the seller's promise as to the truth of the warranties."

Facts of record here do not support defendant's waiver defense. As the Court has concluded in rejecting Lehman's statute of limitations defense, the contents of the environmental reports referenced in Warranty xx would not have alerted plaintiff LaSalle Bank to the fact that the FEL Facility property was environmentally contaminated nor to the fact that Lehman had breached any of its warranties. LaSalle Bank did not at the time of the closing have "full knowledge and acceptance of facts disclosed by the seller" which would render Lehman's warranties false. *See Galli,* 973 F.2d at 151. Under the circumstances, there was no waiver by LaSalle Bank of its right to claim that the warranties at issue were breached by Lehman.

In support of its argument that the Phoenix report and the TTI report contained sufficient information to have resulted in a waiver, defendant relies upon *Johnston v. Metz,* 1993 WL 481395, at *3, 1993 U.S.Dist. LEXIS 16429, at *9 (N.D.N.Y. Nov. 18, 1993). Such reliance is misplaced. In *Johnston,* the seller specifically told the buyer that there was a contamination problem. Lehman never made any such disclosure in this case but has instead merely relied upon an environmental report which concluded that no further action was necessary to address previous environmental concerns.

On the record here, this Court concludes that the Phoenix and TTI reports did not constitute full disclosure by Lehman to LaSalle Bank of facts which would constitute a breach of warranty. Since there were no other disclosures made by Lehman regarding the truth of its warranties, defendant's waiver defense must fail.

(d)

*Prompt Notice of Breach*

Finally, defendant argues that it was not given prompt notice of its alleged

breaches as required by § 2.03 of the PSA and by New York law. Section 2.03 of the PSA provides that if any party to the agreement discovers a breach of any representation or warranty contained in § 3 of the MLPA which materially and adversely affects the interest of the certificateholders, such party shall promptly give notice to the parties to the PSA and to the appropriate rating agencies. Defendant contends that First Union, CMSLP and LaSalle Bank discovered defendant's alleged breaches no later than November 25, 1997, that Lehman was not provided with notice of these alleged breaches until December 11, 2000, and that plaintiff therefore did not act promptly in providing such notice.

As shown by the evidence here, CMSLP first learned of serious environmental contamination of the FEL Facility property on October 9, 2000, when Building Evaluation and Technology, Inc. issued a Phase I environmental assessment of the site revealing that contamination was present prior to the securitization. Some two months later, CMSLP gave notice of Lehman's alleged breaches to LaSalle Bank, to the master servicer, to Lehman and to other interested parties.

This Court concludes that notice to Lehman within two months of discovery by LaSalle Bank of the breaches at issue constituted prompt notice under § 2.03 of the PSA. Defendant's argument to the contrary is based on the false assumption that LaSalle Bank or the special servicer had knowledge of Lehman's breaches on November 25, 1997. As this Court has herein concluded, neither LaSalle Bank nor any other party had been placed on notice of Lehman's alleged breaches on that date. It was not until October 9, 2000 that CMSLP received such notice.

For these reasons, this Court concludes that defendant's lack of prompt notice defense must likewise fail.

## VI

### Remedy for Breaches

■ This Court has herein determined that defendant Lehman has breached warranties and representations contained in the MLPA. Pursuant to § 3(c) of that Agreement, defendant Lehman, since it timely received notice of such breaches, is required, *inter alia,* to repurchase the affected mortgage loan from LaSalle Bank at a price equal to the purchase price. Plaintiff LaSalle Bank is here seeking the entry of an Order requiring defendant Lehman to repurchase the mortgage loan at issue. In view of the pending bankruptcy proceedings involving Howell and Hurley, the parties dispute whether it is now possible for Lehman to repurchase the FEL Facility Mortgage Loan. Plaintiff LaSalle Bank is therefore seeking damages as alternative relief.

■ Under New York law, a loan seller's failure to repurchase non-conforming loans upon demand as required by a contract is an independent breach of the contract entitling the plaintiff to pursue general contract remedies for breach of contract. *Resolution Trust Corp. v. Key Fin. Servs., Inc.,* 280 F.3d 12 (1st Cir.2002). Applying the principles of that case here, this Court concludes that, if it is not possible for defendant Lehman to repurchase the FEL Facility mortgage loan because of the pending bankruptcy proceedings, plaintiff may still recover traditional contract damages in this case. However, the parties here dispute the amount of damages to which plaintiff would be entitled as a result of Lehman's breach of the contract at issue.

The "Purchase Price" is defined in § 101 of the PSA as:

[A] cash price equal to the outstanding principal balance of such Mortgage Loan as of the date of purchase, together with (a) all accrued and unpaid interest on such Mortgage Loan at the related Mortgage Rate to but not including the Due Date in the Collection Period of purchase plus any accrued interest on P & I Advances, and (b) all related and unreimbursed Servicing Advances plus any accrued interest thereon; provided that the Purchase Price shall not be reduced by any outstanding P & I Advances.

In *Resolution Trust,* the First Circuit affirmed the district court's calculation of damages which included the amount which the seller would have paid had it repurchased the loan when it was supposed to have done so, the amount of statutory interest, and the cost of mitigation and servicing. *Id.* at 18.

On the record here, this Court concludes that, as alternative relief, LaSalle Bank is entitled to damages in the amount of $11,497,861.86, reflecting the principal amount of the loan ($8,285,851.57), plus ordinary interest ($1,884,400.59), plus default interest ($899,475.22), plus servicing advances ($798,134.48), and minus sums already collected by LaSalle Bank during the bankruptcy proceeding ($370,000.00). LaSalle Bank has offered no basis for the other items of damages claimed by it. As alternative relief, plaintiff LaSalle Bank is accordingly entitled to a recovery of $11,497,861.86, in damages.

## VII

### Conclusion

For all the reasons stated herein, plaintiff's motion for summary judgment will be granted, and defendant's motion for summary judgment will be denied. The Court will enter an appropriate Order requiring

defendant Lehman to repurchase the FEL Facility Mortgage Loan, or if that is not possible, awarding damages in the amount of $11,497,861.86 to LaSalle Bank.